William G. and Martha C. MARTIN,
Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.

Joseph and Evelyn CREEL,
Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.

Jonnie PARKINSON, Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.

Max ZAGER and Goldie R. Zager,
Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellant.

Nos. 80–1200, 80–3135 and 80–5084.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 6, 1981.

M. Carr Ferguson, Asst. Atty. Gen., Gil-
bert E. Andrews, Chief, Appellate Sect.,

Michael L. Paup, Chief, Appellate Section,
Jonathan S. Cohen, James F. Miller, Attys.,
Tax Div., Dept. of Justice, Washington
D.C., for C.I.R.

Cantey, Hanger, Gooch, Munn & Collins,
Kirk R. Manning, Fort Worth, Tex., for
William G. & Martha C. Martin.

Newton & Shelton, Paul M. Newton,
Gulfport, Miss., for Creel & Parkinson.

Tuggle, Duggins, Meschan, Thornton &
Elrod, William L. Tankersley, III, Greens-
boro, N.C., for Max and Goldie R. Zager.

Before GOLDBERG, REAVLEY and
TATE, Circuit Judges.

TATE, Circuit Judge:

In *Dean v. Commission*, 35 T.C. 1083
(1961), the Tax Court held that the use of
funds from an interest-free loan to a tax-
payer did not constitute a taxable benefit.
The Commissioner's present appeals are his
latest effort to secure an overruling or mod-
ification of the *Dean* rationale, which the
Tax Court followed in the present cases, in
its holding that the interest-free loans did
not result in taxable income herein. De-
spite the persuasive reasons offered by the
dissenting views, we are unwilling to dis-
turb *Dean*, at this late date, and we there-
fore affirm.

The logical anomalies and disparities of
the *Dean* rule, and the extensive commen-
tary critical of it, are well summarized by
our dissenting brother in his excellent and
perceptive opinion. Nor are we unaware
that the solution of the *Dean* anomaly pro-
posed by the dissenting opinion might in-
deed furnish a more rational regulation of
the tax consequences of interest-free rules
than the *Dean* rule does, albeit the proposed
solution substitutes one fiction (i. e., that
interest is "paid", which then is "deducted")
for the *Dean* fiction (i. e, that the interest-
free loan ipso facto does not produce bene-
fits that under normal tax regulation result
in taxable income because the alleged bene-
fit is equalled by a comparable interest

"deduction"). The dissent commendably attempts to improve the rough equity of the *Dean* rule by a more precise attribution of the benefit-deductibility aspects of such a transaction.

On the other hand, the proposed solution implicates complexities in the determination of gross income, and all the attendant computations thereupon based, that might be viewed as derogative of general aims of certainty and ease in the computation of tax consequences of events that have already occurred, as well as in entering into transactions with foreseeable expectation of the tax consequences. (For instance, at what rate, and how, should the "interest" benefit allowed be calculated, for purposes of both gross income and the counter-balancing "deduction"?) Moreover, the *Dean* rule has been applied by the courts and followed without exception since 1961 in the administration of tax returns, and at least one circuit, for reasons doubtlessly similar to those of the present majority, has recently refused to displace it. *Suttle v. Commissioner*, 625 F.2d 1127 (4th Cir. 1980). Thus, even if the solution proposed by the dissent is preferable to the *Dean* rule it is intended to displace, we are not at all certain that its benefits would outweigh the loss of national uniformity in the application of our tax laws.

For these reasons, therefore, we decline to depart from or modify *Dean* and, accordingly, AFFIRM the judgments of the Tax Court.

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

While I am in agreement with much of the result reached by the majority decision, I must vigorously dissent. I do so with respect, but with an even greater sense of bewilderment and astonishment. I cannot join in my brethren's blatant and completely needless abdication of their judicial responsibility, in choosing to transform a transient mistake into an error of law for perpetuity. Neither my frustration nor the wrongfulness of such abdication can be assuaged by the straw men erected by the majority to justify their decision.

The majority has opted to rule in this case by means of a cursory affirmance. However, in order to clearly discuss the area of disagreement between the majority decision and my own view, it is necessary to build upon my agreement with the basic result reached in the majority's opinion: the complete rejection of the government's argument. Since it is impossible to express my dissent without elaborating on a clear, reasoned discussion of the result reached in this case, I have attempted first to fill in where the majority left off: to provide a reasoned elaboration of the panel's holding today rejecting the position of the government. Having done so, I have then attempted to explain my disagreement with the majority's conclusion.

I. *ALL'S NOT QUIET ON THE SOUTHERN FRONT: THE CURRENT CASES*

These three cases basically present another battle between "form" and "substance" in the area of tax law. The government has launched an attack on three fronts against a long-time archenemy by relying exclusively on the artillery of a purely formalistic argument. The government's nemesis—the problem of interest-free loans—has successfully withstood formalistic IRS advances over the past two decades by seeking shelter in a fortress constructed upon an analysis of the policies underlying several provisions of the tax code. No Congress like Vienna's has yet settled this controversy. Thus, the responsibility for introducing a lasting peace into this war torn area lies solely with this panel today.

The facts in all three cases have been stipulated. In each suit, the taxpayers were officers, directors, salaried employees and principal shareholders[1] of a corporation. In the years in question, each taxpay-

---

1. In No. 80–1200, *Martin v. Commissioner*, the stock of the corporation was issued to a trust set up for the use and benefit of the taxpayer's children. This slight factual variation is of no consequence to our decision today.

er secured interest-free loans from the corporation. Whether or not these sums have actually been repaid, the Commissioner of Internal Revenue ("Commissioner") has never contended that these advances were not bona fide loans.

In each case, the Commissioner determined that the taxpayer had realized unreported taxable income as a result of the interest-free loans and issued notices of deficiency. In these notices, the Commissioner relied on the prevailing prime interest rate to determine the unreported value of the use of the borrowed money. In each case the Tax Court ruled that the use of funds without interest did not constitute a taxable benefit to the taxpayer, relying on its 1961 decision in *J. Simpson Dean v. Commissioner*, 35 T.C. 1083 (1961). The Commissioner filed these appeals contesting the Tax Court's determinations that the taxpayers in each of the three cases did not have additional taxable income by virtue of the use of interest-free loans.

## II. *THE INVASION OF THE MONEY-SNATCHERS: THE ATTACK OF FORM*

The government presents a cogent argument relying exclusively on a literal application of two provisions of the Internal Revenue Code, sections 61 and 163(a). I.R.C. section 61 defines gross income as "all income from whatever source derived." It hardly needs to be noted that the provision is to be broadly construed. *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct.

358, 369, 93 L.Ed. 477 (1949) ("the income taxed is described in sweeping terms and should be broadly construed in accordance with an obvious purpose to tax income comprehensively"). In discussing the predecessor to section 61 (section 22(a) of the Internal Revenue Code of 1939) in the famous case of *Commissioner v. Glenshaw Glass*, the Court commented:

This Court has frequently stated that this language was used by Congress to exert in this field "the full measure of its taxing power." Congress applied no limitations as to the source of taxable receipts, nor restrictive labels as to their nature. And the Court has given a literal construction to this broad phraseology in recognition of the intention of Congress to tax all gains except those specifically exempted.

348 U.S. 426, 429–30, 75 S.Ct. 473, 475–76, 99 L.Ed. 483 (1955) (citations omitted). Based on this broad reading of section 61, courts have included in gross income the free use of such assets as homes,[2] automobiles,[3] and houseboats[4] provided by a corporation. Similarly, the payment by a corporation of compensation in kind[5] such as employer-financed vacation trips[6] and free meals[7] has been considered taxable income under section 61. The standard mode used by courts to analyze the inclusion within gross income of such perquisites is a comparison of the case in which an employee or shareholder receives, for example, the free use of a car with a rental value of five

---

2. The fair rental value of a home furnished to a taxpayer has been held includible in gross income under I.R.C. section 61, where it was not excludable under the specific provisions of I.R.C. section 119. *E.g.*, *Atlanta Biltmore Hotel Corp. v. Commissioner*, 349 F.2d 677 (5th Cir. 1965); *Commissioner v. Anderson*, 371 F.2d 59 (6th Cir. 1966), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1687, 18 L.Ed.2d 623 (1967); *Dole v. Commissioner*, 43 T.C. 697, *aff'd*, 351 F.2d 308 (1st Cir. 1965) (per curiam).

3. *E.g.*, *Gardner v. Commissioner*, 613 F.2d 160 (6th Cir. 1980); *Commissioner v. Riss*, 374 F.2d 161 (8th Cir. 1967); *Hornung v. Commissioner*, 47 T.C. 428 (1967).

4. *E.g.*, *United Aniline Co. v. Commissioner*, 316 F.2d 701 (1st Cir. 1963); *Finney v. Commissioner*, 39 T.C.M. (CCH) 938 (1980).

5. Treas. Reg. § 1.61–2(d) (1957) states the basic rule as follows: "If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income." *See*, Sneed, *Unlabeled Income and Section 483*, 1965 So.Cal.Tax.Inst. 643, 645.

6. *E.g.*, *Rudolph v. United States*, 291 F.2d 841 (5th Cir. 1961), *cert. dism'd*, 370 U.S. 269, 82 S.Ct. 1277, 8 L.Ed.2d 484 (1962); *Silverman v. Commissioner*, 253 F.2d 849 (8th Cir. 1958).

7. *See* I.R.C. § 119.

thousand dollars, with the case of another employee or shareholder who receives an additional five thousand dollars as compensation or dividends and rents the same car. Since the net result of the two transactions is identical, the tax consequences should also be identical.

There can be little doubt that the free use of money provided by a corporation should fall within the broad construction afforded section 61. The use of money—the opportunity to make additional income or to spend today and pay tomorrow—is a valuable right, which individuals must usually pay for by securing interest-bearing loans. Interest is a form of "rent" on the use of money; a corporation's decision not to charge such "rent" should stand, from a tax perspective, on an equal footing with a decision not to charge rent for the use of a home, car or boat. Returning to the mode of analysis detailed above, the employee who saves one hundred dollars by securing a one year interest-free loan of one thousand dollars at a time when interest rates are 10% is compensated in a manner identical to an employee who is paid an extra one hundred dollars and arranges a one year, interest-bearing loan of one thousand dollars. The computation under section 61 of these two employees' gross income should not differ as a result of the loan transactions. Hence, the receipt of an interest-free loan from a corporation represents an economic benefit, the value of which should be included, pursuant to section 61, within a taxpayer's gross income.

Having reached this conclusion, the government applies its very literal reading of the tax code to the deduction side of the ledger. The Commissioner asserts that no section within the code establishes a deduction which the recipient of an interest-free loan can claim in order to offset this addition to gross income. The provision within the code controlling the deductibility of interest, I.R.C. section 163(a), establishes a deduction for all interest "paid or accrued." By definition, the government argues, a

taxpayer who receives an "interest-free" loan neither pays nor accrues interest. The taxpayer is, therefore, not entitled to the deduction provided by section 163(a). Putting these two arguments together, the government asserts that a taxpayer's gross income should be increased by the value of the free use of the loaned money, while no deduction to offset this increase may be claimed. Hence, the taxpayer's net taxable income should be increased by the value of the interest-free loan. The government's formalistic attack seems insurmountable; the battle seems to be over almost before it begins.

III. *HOW THE SOUTH WAS WON: THE VICTORY OF SUBSTANCE*

Upon scrutiny, however, the government's attack appears to be more seductive than overpowering. As any old soldier can see, the government is merely employing the time-tested military tactic of "divide and conquer": by slicing up the tax code and interpreting the income and deduction provisions independently and literally, the Commissioner is able to disregard the true economic reality of the transaction at issue. However, this strategy must ultimately fail as the "economic reality" of a transaction— the "substance of the thing done and not the form it took" [8]—must ultimately govern taxability.

By basing its attack exclusively on a technical, literal and myopic reading and application of two tax code provisions, the Commissioner's siege suffers from a weakness which has historically plagued many great generals who have sought to enforce codifications of the law in a completely literal manner. The words first spoken in 1827 by the drafters of Napoleon's French Civil Code are equally meaningful in 1981 with reference to the tax code:

A code, however complete it may appear, is no sooner promulgated than a thousand unexpected questions are presented to the judge. Because the laws, once written, remain as they were

---

**8.** *Commissioner v. Ashland Oil & Ref. Co.*, 99 F.2d 588, 591 (6th Cir. 1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 786, 790, 83 L.Ed. 1057 (1939).

written. Man, on the contrary, never remains the same, he changes continually....

. . . .

There is a science for the legislator, as there is one for the judge; and the one does not resemble the other. The science of the legislator consists in finding, in each matter, the principles most favorable to the common good; the science of the judge is to put the principles in action, to develop them, to extend them, by a wise and reasoned application, to private relations; to study the spirit of the law when the letter kills....[9]

In the present battle, the murderous letter of the law is the government's most potent weapon. But it is a weapon which must ultimately be overcome by the artillery of substance. In applying the "income" provision of the code, the government recognizes that the recipient of an interest-free loan is in substance receiving additional compensation or dividends from the corporation with which to secure a loan and pay the interest thereon. Yet in applying the "deduction" provision, the government ignores the substance of the transaction, and seeks to deny the taxpayer the offsetting deduction for interest, by arguing that no interest is actually "paid or accrued." The argument creates the gross injustice—an injustice not mandated by the tax code [10]—of imposing different tax liability on two taxpayers who are in identical situations. Taxpayer A, who receives $10,100 in compensation and dividends from a corporation and pays $100 interest on a one-year $1000 loan, will be taxed, in most cases,[11] on $10,000 income. The extra $100 income used to secure a loan will, in most cases, "wash" with the $100 interest deduction, and will therefore not affect Taxpayer A's tax liability. However, Taxpayer B, who receives $10,000 plus an interest-free loan worth $100 (e. g., an interest-free loan of $1000 at a time when interest rates are 10%), in compensation or dividends, will be taxed, according to the Commissioner, on $10,100. According to the Commissioner, the extra $100 income from the loan cannot "wash" with an equal interest deduction because no interest is actually paid.

This illogical and unjust result is neither required by nor even permitted under a fair and proper application of the Internal Revenue Code. Rather, once it is recognized that the receipt of an interest-free loan is equivalent to the receipt of additional income by which to "purchase" the loan, it must also be recognized that having received an interest-free loan is equivalent to having paid the interest on that loan. Therefore, in cases where the taxpayer could have deducted the interest on an interest-free loan had it actually been paid, no net taxable income can be charged as a result of the interest-free loan.[12]

**9.** Portalis, Tronchet, Bigot-Préameneu & Maleville, Discourse préliminaue in 1 J. Locre, La Legislation Civilé, Commerciale et Criminelle de la france, 251 at 255–72 (1827), *reprinted in* A. von Mehren and J. Gordley, *The Civil Law System*, 54–55 (2d ed. 1977). Most Frenchmen familiar with the code seem to have accepted this principle of interpretation—except for Napoleon himself. The French emperor, the fourth child of a Coriscan lawyer, upon hearing that the first commentary on his code had been published, is reputed to have exclaimed "My code is lost." J. Merryman, The Civil Law System, 20–21 (1969).

Napoleon's attempt to enforce the literal words of his code, without interpretation, was relatively moderate when compared to the actions of the Roman Emperor Justinian. In fact, Justinian the Great made it a crime to publish a commentary interpreting his *Corpus Juris Civilis*. His efforts were no more successful than those of Napoleon. *See generally,* R. Allen, *Common Law, Statute, Constitution, Code: Federal Common Law In Light of Larger Modes of Sovereign Command,* 18–31 (unpublished paper on file in the library of the United States District Court for the Northern District of Texas, Chambers of Judge Robert M. Hill) (an insightful analysis of the role of codes in law and of the proper mode of interpreting codes).

**10.** *See* note 17 *infra.*

**11.** *See* pp. 1140–1141 *infra.*

**12.** The Commissioner provides one example aimed at proving that substance and equity, as well as form, supports the conclusion he advocates. Relying on a note appearing in the University of Chicago Law Review, Note, *Taxing as Income the Receipt of Interest-Free Loans,* 33 U.Chi.L.Rev. 346, 349 (1966), the govern-

This result and the resounding rejection of the government's argument is supported by every court to have considered the problem as well as by the overwhelming majority of the scholarship in the field. In the ment argues that the recipient of an interest-free loan is actually in a better economic position than a taxpayer who secures an interest-bearing loan. The government's example states:

> For example, if A, a cash basis taxpayer in the 70 percent tax bracket, the current maximum rate, borrows $1,000 at 10 percent interest for one year he will pay $100 in interest charges. Assuming all of the Code requirements are met, A will save $70 on his federal tax bill because of the $100 interest deduction. Therefore, the net out-of-pocket cost of the loan to A is $30 ($100 – $70). If, on the other hand, A borrows $1,000 from his controlled corporation or employer at no interest, he will incur no out-of-pocket expense

first and still landmark opinion on the subject of interest-free loans—the governing surrender agreement in this war for the past two decades—*J. Simpson Dean v. Commissioner*, 35 T.C. 1083 (1961), the Tax whatever. The net benefit to A in securing an interest-free loan would thus be $30.

To analyze the flaw in the Commissioner's example, we should examine the cases of three taxpayers, A, B, and C. All three taxpayers are in the 70% bracket and all three secure $1,000 loans at a time when interest rates are 10%. Neither A nor C receives an interest-free loan from their corporations and, thus, both pay $100 interest on the $1,000 loan. Therefore, (assuming at this point that A and C can deduct the interest) both A and C gain a $70 tax saving from securing the loan and paying the interest. B, on the other hand, receives an interest-free loan from his corporation and gains no deduction. The salaries, loans and taxes of A, B, and C may thus be charted as:

| | Base Pay | Amount of Compensation Due to Loan | Gross Income | Interest Expense For Loan | Imputed or Actual Interest Deduction | Taxes | After Taxes, After Loans Income |
|---|---|---|---|---|---|---|---|
| A | $10,100 | None | $10,100 | $100 | $100 | $7,000 | $3,000 |
| B* | $10,000 | $100 | *$10,000 | None | *0 | *$7,000 | *$3,000 |
| B** | $10,000 | $100 | **$10,100 | None | **0 | **$7,070 | **$2,930 |
| B*** | $10,000 | $100 | ***$10,100 | None | ***$100 | ***$7,000 | ***$3,000 |
| C | $10,000 | None | $10,000 | $100 | $100 | $6,930 | $2,970 |

\* Pursuant to the solution adopted by the majority today

\*\* Pursuant to the solution advocated by the government

\*\*\* Pursuant to the solution advocated by this dissent, with the $100 entry for "imputed or actual interest deduction" subject to the exceptions explained in Section IV of this opinion.

---

B represents the taxpayer in the present case. If the interest-free loans are not taxed, B ends up in a position identical to that of A—the taxpayer who does not get a free loan but receives $100 additional compensation (in place of the loan). However, if we taxed B for the loan, he would be in a substantially worse position than A. Hence, the government is able to make its "equity" argument solely by committing the error (without expressly so noting) of choosing C as the comparison to B. Both taxpayer C and taxpayer B receive $10,000 in base pay, but C does not receive an interest-free loan. In order for C to obtain a loan, he must spend—in post-tax figures—thirty dollars in interest. Therefore, it is true C has $30 less than B—the post-tax cost of the loan. However, this $30 differential is caused by the fact that B is a higher-paid employee having received a $100 additional compensation from the corporation in the form of an interest free loan (and C mitigates this difference by spending $100 interest on a loan, which is deductible and C thereby forces the government to "pay" $70 of the difference). An employee who makes $10,000 and gets a $100 fringe benefit is higher paid than an employee who is merely paid $10,000. The $30 post-tax margin results. However, employee B, who receives $10,000 base pay and a $100 fringe benefit, is equal in salary grade to employee A, who receives a base pay of $10,100 and no interest-free loan. These two employees would, in fact, have comparable tax bills, if B's interest-free loan is not taxed. The Commissioner should have compared persons B and A rather than persons B and C in the cited example.

Court rejected the Commissioner's argument that interest-free loans should be taxed in a manner identical to the situations of the free use of a car or house:

> In each of [the cases relied on by the government] the free house, car or food cases a benefit was conferred upon the stockholder or officer in circumstances such that had the stockholder or officer undertaken to procure the same benefit by an expenditure of money such expenditure would not have been deductible by him. Here, on the other hand, had petitioners borrowed the funds in question on interest-bearing notes, their payment of interest would have been fully deductible by them under section 163, I.R.C. 1954. Not only would they not be charged with the additional income in controversy herein, but they would have a deduction equal to that very amount. We think this circumstance differentiates the various cases relied upon by the Commissioner, and perhaps explains why he has apparently never taken this position in any prior case.

More recently, the Tax Court in *Greenspun v. Commissioner*, 72 T.C. 931 (1979), appeal docketed, No. 79–7624 (9th Cir.) has noted its agreement with *Dean* and with the mode of analysis relied on by this court today:

> Underlying this reasoning was the idea that, economically speaking, an interest-free loan from a corporation to its shareholder or employee is in substance no different from the making of a loan on which interest is charged accompanied by an increase in dividends or compensation in an amount equal to the interest charged. Consequently, to give effect to the economic reality of the situation, we attempted in *Dean*, to equalize the tax treatment of the two loan transactions.
>
> . . . .
>
> In short, by excluding from gross income the clear economic benefit realized upon the receipt of a low or no-interest loan to a shareholder or employee, in *Dean* we properly sought to place such a transaction on a tax parity with interest-bearing loans accompanied by an increase in dividends and salary.

72 T.C. at 947–950. Moreover, the Tax Court in *Greenspun* expressly addressed and rejected the government's literal reading of section 163(a):

> With respect to respondent's (Commissioner's) contention that petitioner (taxpayer) would not be entitled to an offsetting interest deduction under section 163(a), we recognize that as a general rule a cash basis taxpayer may not deduct interest unless such interest has actually been paid pursuant to a legal obligation... .
>
> However, none of the cases which have applied the general rule have dealt with the precise question of whether a taxpayer who must report as income the economic benefit associated with a low or no-interest loan is entitled to claim an offsetting interest deduction. In such a case, we think an exception to the general rule of deductibility is both appropriate and necessary to give recognition to the economic realities of the transaction.

72 T.C. at 951.

In the only case to reach the federal appellate courts, *Suttle v. Commissioner*, 625 F.2d 1127 (4th Cir. 1980), the Fourth Circuit issued a short opinion relying exclusively on *Dean* to reject the same attack which the government has launched in the three cases at bar today. Finally, nearly all of the law review articles on the subject of interest-free loans—some of which provide compelling and exhaustive analyses of the issue—have concluded that the government's argument is not only clearly unjust, but also, neither logical nor compelled by the language of the tax code. *See, e. g.,* Keller, *The Tax Consequences of Interest-Free Loans From Corporations To Shareholder's and From Employers to Employees,* 19 B.C.L.Rev. 231, 240 (1978); Sneed, *Unlabeled Income and Section 483,* 1965 So. Cal.Tax Inst. 643, 653; Duhl and Fine, *New Case Allowing Interest Deduction Calls for Reappraisal of No-Interest Loans,* 44 J.Tax. 34, 35, 38 (1976). *But see,* O'Hare, *The Taxation of Interest-Free Loans,* 27 Vand. L.Rev. 1085, 1095 (1974).

## IV. *APOCALYPSE NOW: REVISING DEAN OR PERPETUATING ERROR*

As noted above, it seems clear as a matter of precedent, logic and equity that no net taxable income should result from an interest-free loan in cases where the taxpayer could have claimed a deduction had he actually paid interest. Therefore, it is clear to all three members of the panel that the government's argument in these cases must be rejected. However, remembering the Alamo, this panel has the responsibility of ensuring that the government surrenders only to a proper conceptualization of the solution. Therefore, a difficult question exists as to how this result should be structured to conform to, or may best be expressed in terms of, the commands of the tax code. This panel must not only decide the taxability of such loans, but also the mechanics of reporting their receipt. While there are several possible alternatives for treating the receipt of an interest-free loan for tax purposes, only one mode of analysis has been thus far employed to keep the peace in this demilitarized zone for the past two decades. That solution, first formulated in the *Dean* opinion and sealed, perhaps for perpetuity, by the majority today provides that since the inclusion in income of the interest-free loan's benefit would have been balanced by an equivalent deduction, there is no reason to include the benefit within gross income. Therefore, interest-free loans are deemed to fall outside the scope of I.R.C. section 61.

Even the most cursory review of the literature and subsequent Tax Court opinions reveals that virtually everyone who has reviewed the *Dean* solution—save for my two brethren on this panel—has recognized its flaws and clamored for their correction.

The criticism of the *Dean* analysis emerged even before the ink had dried on the *Dean* peace treaty. *See Dean, supra*, 35 T.C. at 1090 (Opper, J., concurring); *Dean, supra*, 35 T.C. at 1091 (Bruce, J., dissenting). Moreover, the sniper attacks at the *Dean* majority have continued unrelentlessly, with each new foray lending reenforcement to the claims of those combatants who had previously joined the fray. *See, e. g.*, Taylor and Schnee, *Interest-Free Loans: A Need for Caution*, 58 Taxes 263 (1980); Duhl and Fine, *Interest-Free Loans and the Tax Court: Is Dean Weakening Under IRS Attacks?*, 51 J.Tax 322 (1979); Keller, *The Tax Consequences of Interest-Free Loans From Corporations to Shareholders and From Employers to Employees*, 19 B.Col. Ind. & Comm.L.Rev. 231 (1978); Duhl and Fine, *New Case Allowing Interest Deduction Calls For Reappraisal of No-Interest Loans*, 44 J.Tax 34 (1976); Sneed, *Unlabeled Income and Section 483*, 1965 U.So. Cal.Tax Inst. 643; *see also*, Comment, *An Interest-Free Loan Borrower or Lender Be: Gift Tax Implications of Interest-Free Loans*, 53 N.Y.U.L.Rev. 941, 957–58 (1978). Finally, the very authors of *Dean*—the Tax Court—have acknowledged the mistakes contained in that opinion and have signaled higher courts to right their wrong. *Greenspun v. Commissioner, supra*, 72 T.C. at 948–950; *Zager v. Commissioner*, 72 T.C. 1009, 1012 (1979).[13]

Regardless of whether the majority decision is read as myopic or merely forgiving, it is indisputable that the *Dean* analysis contains two major flaws. First, the result in *Dean* explicitly rests on the assumption that the inclusion in income of the benefit of an interest-free loan would, in all cases, have been balanced by an equivalent deduc-

---

**13.** Since the government has chosen to seek the complete reversal of *Dean* and to argue that interest-free loans must always increase taxable income, they have not argued that the *Dean* solution should be affirmed in an altered form. Therefore, in a case where the alterations advocated herein do not affect tax liability or where the issue of how to report the loan is never brought to a panel's attention, then a panel faced with completely affirming or reversing the *Dean* result may be justified in issuing a short per curiam affirming *Dean*. *See Suttle v. Commissioner*, 625 F.2d 1127 (4th Cir. 1980). However, the unanimous criticism of the *Dean* solution—unanimous at least until today—has been brought to the attention of the Court, and the acceptance of the compelling logic espoused in such criticism will, in fact, affect the liability of at least some of the taxpayers before us. Under these circumstances, the path followed by the Fourth Circuit in *Suttle* is not the proper route for this Court.

tion under section 163(a) had the interest actually been paid. This broad assumption is clearly unwarranted. For example, it is obvious that a taxpayer who does not use the interest-free funds for business purposes [14] and does not itemize his deductions would not be entitled to deduct the interest (even if it were paid). *See* I.R.C. § 63. Moreover, even the taxpayer who itemizes his deductions would not be entitled to an interest deduction if the indebtedness was "incurred ... to purchase or carry obligations ... the interest on which is wholly exempt from ... taxes" 35 T.C. at 1091 (Opper, J., concurring) (citing I.R.C. § 265(2)). Interest deductions may be disallowed in other less common situations as well. For example, no deduction generally is allowed for any interest "paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or annuity contract," I.R.C. § 264; or for certain interest paid or accrued by a noncorporate taxpayer to carry investment property which produces little or no current income, I.R.C. § 163(d)(1). In addition, interest can be denied in certain sham transactions, *see, e. g., Knetsch v. United States,* 364 U.S. 361, 362–70, 81 S.Ct. 132, 133–37, 5 L.Ed.2d 128 (1960). *See generally Keller, supra,* at 236, 237, 237 n.5 (discussing those situations in which an interest deduction may be denied). Thus, the analysis in *Dean* threatens to permit two taxpayers in identical situations to be taxed differently, and the majority opinion today expressly endorses this inequitable result which earlier caused this Court to reject the analysis advanced by the Commissioner. An example of this potential injustice was provided by the Tax Court itself in 1979 in criticizing the *Dean* opinion:

> For example, ... assume that ... A invests the proceeds of [a] $20,000 loan in securities yielding $1,000 of interest income per annum which is exempt from taxation under section 103. In the [case of an] interest-free loan by X Co., under *Dean,* A will have no taxable income at year's end. In the [case] where A is paid a salary of $1,000 and charged $1,000 of interest on the loan, A would have $1,000 of gross income but would be unable to deduct his payment of the interest by virtue of section 265(2). The end result is that X Co. in granting the loan interest-free has enabled A to effectively convert $1,000 of taxable compensation into $1,000 of tax-exempt interest income.

*Greenspun, supra,* 72 T.C. at 949. But we need not even resort to hypotheticals discussed in the *Greenspun* decision to observe the injustice wrought by the majority's decision today; we need only refer to the case of those taxpayers before us, (*e. g.,* Jonnie Parkinson) who did not itemize their deductions for the years in question. The majority chooses to characterize the gift of a tax dodge to such taxpayers as an "anomaly," majority opinion *supra* pp. 1133–1134; however, the only thing I find anomalous about this injustice is our refusal to correct it.

The second major error in the *Dean* opinion is the assumption that since the addition to income from an interest-free loan will often be offset by an imputed or constructive interest deduction, there is no reason to include the benefit of the loan within gross income under section 61 and to force the taxpayer to report the offsetting deduction under section 163. The *Dean* majority felt that the "wash" between the additional income and imputed deduction should be handled by holding that interest-free loans fall outside the scope of section 61. However, even in those cases in which the income and deduction resulting from the loan would offset one another, the mode of reporting this wash has extremely important consequences of both a conceptual and a practical nature. First, as a matter of pure theory, the holding in both *Dean* and the majority's decision today that interest-free loans fall

---

**14.** A taxpayer who incurs an interest expense as a business expense or for the production of rents or royalties is entitled to deduct the expense from gross income in arriving at adjusted gross income. *See* I.R.C. § 62(a). Thus, the

*Dean* court's broad assumption is warranted in those cases where had the interest on a loan been paid, it would have qualified as an expense under § 62(a).

outside the scope of section 61 does great damage to the evolving design of that section: to tax any valuable economic benefit which serves as a form of compensation to an employee or as a dividend to a shareholder. In short, there is no logical or equitable distinction under the law controlling section 61 between the free use of money and the free use of a car. Moreover, such an easily eliminated distinction cannot be excused and the damage it causes cannot be alleviated merely by characterizing the situation as an "anomaly." Second, as a matter of tax practice, the choice between expressing the "wash" at issue by excluding the economic benefit of an interest-free loan from income or, alternatively, reporting both the benefit as income and, in appropriate cases, also claiming an offsetting imputed interest deduction, has important tax repercussions. As noted by many scholars, see e. g., Keller, supra at 235, and by the Tax Court itself, see Greenspun, supra, 72 T.C. at 949, the exclusion of the benefit of interest-free loans from income causes disparate tax treatment in those cases where another claimed deduction is limited, by law, to a percentage of adjusted gross income.[15] For instance, most medical deductions under section 213 are limited to an amount which exceeds 3 percent of a taxpayer's adjusted gross income. If the economic benefit of an interest-free loan is not included in adjusted gross income, the allowable medical deduction will be overstated. Conversely, the amount of an individual's allowable deductions for charitable contributions under section 170 cannot exceed a certain percentage of the taxpayer's adjusted gross income. In this instance, if the economic benefit of an interest-free loan is not included in adjusted gross income, the

maximum allowable charitable deduction will be understated. Therefore, in these and other situations,[16] the no-income, no-deduction approach fails to give effect to provisions of the tax code by excluding from gross income and, thus, from adjusted gross income, the impact of the economic benefit resulting from the receipt of an interest-free loan.

Therefore, while I agree with the main goal of the Dean opinion and of the majority decision today—insuring that no net taxable income results from the receipt of an interest-free loan in cases where the interest would have been deductible if paid—I feel that the Dean court achieved overkill by its analysis. Moreover, the Dean court's overkill has been transformed into mass annihilation by the majority opinion. It is simply illogical and unjust to allow the recipient of an interest-free loan to deduct imputed or constructive interest which would not have been deductible even if interest had been paid and to underreport adjusted gross income. In order to correct these problems, the proper mode of treating and reporting the receipt of an interest-free loan is to require the borrower to include the value of the interest-free loan as income under section 61, but to allow the recipient to deduct the interest under section 163(a) in those cases where the interest would have previously been deductible if "paid." This approach achieves the result in all cases of taxing the receipt of an interest-free loan in a manner identical to the receipt of additional compensation or dividends combined with the use of these funds to acquire an interest-bearing loan. Like situations will thereby be taxed alike. See Keller, supra at 231 ("the failure of our taxing system to treat the interest-free loan

---

**15.** This result does not obtain, however, where the borrower's deduction for the constructive interest payments constitutes a business expense or is attributable to property held for the production of rents or royalties. In such cases, the constructive interest deduction reduces gross income. See note 14 supra. Because this reduction in gross income arising from the constructive interest payment exactly equals the increase in adjusted gross income attributable to the economic benefit of the interest-free loan, the reduction and increase cancel one another. As a result, adjusted gross income

remains the same as it would have been had neither adjustment been made.

**16.** See, e. g., I.R.C. § 219 (deduction for retirement savings); I.R.C. § 220 (deduction for retirement savings for certain married individuals); I.R.C. § 6012 (return filing requirements); I.R.C. § 6013(e) (innocent spouse provisions); and I.R.C. § 6501(e) (statute of limitations on assessment of taxes) all of which contain rules conditioned on the amount of a taxpayer's gross income.

in conformity with its analogous two-payment transaction cannot be justified. Instead, the interest-free loan should be treated identically with its two payment counterpart, by employing a 'two-payment transaction analysis' ").[17]

In summary, the taxpayer receiving an interest-free loan should be treated identically with the economically equivalent taxpayer who receives a cash dividend or salary increase and pays interest in discharge of a bona fide obligation. Both taxpayers should recognize income in the amount of the actual or constructive dividend or compensation and both should be permitted a deduction in the equivalent amount of the actual or constructive interest payment, in cases where the interest deduction would have been available if the interest had been paid.

## V. A SEPARATE PEACE: JUDICIAL ACTIVISM AS PASSIVISM, JUDICIAL RESTRAINT AS ABDICATION

The virtually unanimous voice of a great number of scholars addressing the problem

---

**17.** This majority opinion notes, in passing, that the solution proposed in this dissent "substitutes one fiction (i. e., that interest is 'paid,' which then is 'deducted') for the *Dean* fiction (i. e., that the interest-free loan ipso facto does not produce benefits that under the normal tax regulation result in taxable income because the alleged benefit is equalled by a comparable interest 'deduction')." Majority opinion *supra* at 1133–1134. If this statement is meant to imply that these so-called "fictions" are equally illegitimate, I cannot disagree more strongly. While I recognize that the line between "interpretation" and "fiction" is by no means a clear one, I feel that the position of this dissent falls clearly on the side of interpretation. The interpretation of the tax code in a logical and sensible manner is not only "legitimate," but is, in fact, the duty of a court faced with a problem which was clearly not envisioned by the scriveners of the Code. It is a court's duty to bestow upon the code's provisions "a quality of rationality." Brown, The Growing Common Law of Taxation, 1961 So.Cal.Tax Inst. 1, 7–8. In applying Professor Brown's notion of "a quality of rationality" to the paradoxical interpretation of section 163(a)'s "paid or accrued" clause which is advocated by this dissent, Professor Keller has done as fine a job of defending this analysis as I could hope to do:

> When Professor Brown speaks of giving the statute "the quality of rationality," he obviously means that it would be irrational to tax a person who received a $5,000 automobile differently from the similarly situated taxpayer who received $5,000 cash and purchased the automobile. Now, if Professor Brown were asked whether a taxpayer who received an interest-free loan, the economic benefit of which he was required to take into income, should be able to take a deduction for interest neither paid nor owed, presumably his answer would be:
>
> > [W]e should, I am sure, stretch the word[s "interest paid or accrued"] almost out of recognizable shape to make [them] mean the amount at which the [interest-free loan] was taken into income and we should feel justified in doing so in order to give the statute the quality of rationality.

Moreover, this non-literal reading of section 163(a) has already received substantial support—both directly and indirectly—in previous attempts to achieve rational tax results. For example, in its 1979 opinion in *Greenspun v. Commissioner*, the Tax Court, in the face of a serious attack on its decision in *Dean*, retreated to the analysis adopted today as a sanctuary in the war zone:

> When and if we are confronted with such a case, we will decide at that time whether *Dean* is applicable, and if so, whether we shall continue to adhere to our decision in *Dean*. In the circumstances of the present case, however, whether or not we rest our conclusion on *Dean*, our decision of no deficiency would be the same. In other words, if petitioner were required to include as income the economic benefit associated with the loan, he would be deemed to have simultaneously paid an amount of interest equal to the income so reported. Under our facts, such interest would in turn have been fully deductible under section 163(a), the same as if it actually had been charged and paid.

72 T.C. at 949. *See also, Dean, supra*, 35 T.C. at 1091 (Opper, J., concurring). Similarly, in a 1973 revenue ruling, Rev.Rul. 73–13, 1973–1, C.B. 42, the I.R.S. was faced with the case of a corporation paying a professional counseling firm to advise a number of its highly paid executives concerning the handling of their personal financial affairs. The I.R.S. ruled that the particular executive at issue had realized income equal to the fee paid on his behalf, but was entitled to an equal offsetting deduction under I.R.C. section 212 for the ordinary and necessary expenses "paid" for financial counseling. The I.R.S. made this ruling, despite the fact that the financial counseling expense was neither literally "paid" by the executive, nor literally an expense of the executive at all. It was the payor corporation, and not the executive, which had contracted for the services of the counseling firm and which was liable for its fee.

of interest-free loans has clamored for the revisions rejected by the majority decision today. The Tax Court has previously acknowledged that the *Dean* solution would need alteration when a case with proper facts—like the cases at issue today—was presented. Even the majority opinion today first acknowledges the "logical anomalies and disparities of the *Dean* rule" and then refers to the solution advocated in this dissent as "more rational" and "more precise." In light of the foregoing, can there be "method" to the majority opinion's "madness"?[18] With all due respect, I think not. I have pondered at length why this panel should reject the more intellectually sound solution for one which abdicates responsibility and begrudgingly accepts error. The answer has not been forthcoming.

The only justifications discussed by my brethren for adopting the less rational, less precise and less equitable solution are "the general aims of certainty and ease in the computation" of tax liability. The only problem expressly noted by the majority which would result from the adoption of this dissent's position concerns what rate of interest should be chosen to calculate the benefit of an interest-free loan. However, that problem is a mere straw man since the government has already announced its desire merely to charge the prevailing prime interest rate, and the taxpayer has recognized that such rate represents a bargain in the event that these loans are taxed. Having determined the proper interest rate, the cited difficulties of computation are reduced to a grade school exercise in multiplication.[19]

Each of the Tax Court judges in the current cases felt bound by *stare decisis* to overrule an admittedly errant decision of that Court. But federal appellate judges are not bound by the chains of lower court decisions, and indeed are charged with the responsibility of correcting errors in those decisions. Moreover, the revision of the *Dean* doctrine which has existed for two decades—unchanged only because never properly challenged—can only protect and foster the basic expectations of those who relied on *Dean* in securing interest-free loans. The obvious flaws in the *Dean* truce pact has invited constant attack by government forces. The numerous bombs of legal scholarship dropped during the past twenty years, the government's relentless attacks, and the Tax Court's hesitancy to reestablish its position in the 1979 *Greenspun* decision, all highlight the inability of the current solution to maintain peace in this area. The total collapse of the *Dean* treaty will produce the unjust result, advocated by the government in this case, of increasing a taxpayer's net taxable income by the value of the interest-free loan. A slight adjustment of the terms of the *Dean* pact would merely refortify the weak clauses in the treaty in an effort to prevent future attacks. Moreover, such a decision would in no way hinder the ability of Congress to legislate in this area in any fashion it desires.

The initial answer to every new problem necessarily represents the most certain solution until a better solution is formulated. The conclusion that the world was flat led to certainty in navigation, albeit almost at the price of discovering the New World. While the certainty of an erroneous solution may represent a temporary comfort for those who embrace it, it may well represent an injustice for those who are subject to it. When charged with a duty to correct a remediable and harmful error in the law, judicial restraint can only represent judicial abdication.

I would require the recipient of an interest-free loan to include the value of the loan in gross income, and then to claim a deduction in the equivalent amount for imputed interest, where the interest deduction

---

**18.** *See* W. Shakespeare, *Hamlet,* Act II, Sc. 2.

**19.** Moreover, for the overwhelming number of taxpayers who secure interest-free loans, no recomputation of liability will be necessary. Such taxpayers generally itemize their deduc-
tions and do not incur medical expenses in an amount greater than 3% of their adjusted gross income. Therefore, the changes advocated in this dissent will virtually never affect such taxpayers.

would have been available if interest had been paid. The tax consequences of the receipt of an interest-free loan should thus parallel the situation of a taxpayer who receives additional dividends or compensation and pays interest on an interest-bearing loan. Therefore, I would remand these cases for a recomputation of the tax liability, focusing on such factors as whether the taxpayer in each case itemized his deductions, reported tax-exempt interest income, or claimed deductions which were limited to a percentage of adjusted gross income.

I dissent.