708 F.2d 661
 83-1 USTC P 9353
 W.L. HARDEE and Elnora L. Hardee, Appellants,
v.
The UNITED STATES, Appellee.
 Appeal No. 84-79.
 United States Court of Appeals,
Federal Circuit.
 May 11, 1983.
 
 Michael W. Fisher, Jacksonville, Fla., argued for appellant. With him on the brief was John S. Ball, Jacksonville, Fla.
 Theodore D. Peyser, Jr., Washington, D.C., argued for appellee. With him on the brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Donald H. Olson and Kevin B. Shea, Washington, D.C.
 Before MARKEY, Chief Judge, and NICHOLS, BALDWIN, KASHIWA and NIES, Circuit Judges.
 NICHOLS, Circuit Judge.
 
 
 1
 This case is before the court on appeal from a judgment* of the United States Claims Court in which the trial judge held that an interest-free loan from a closely-held corporation to its majority shareholder and president results in taxable income to this borrower. The trial judge thus refused to follow the well-entrenched principle of tax law that such loans do not result in taxable gain to the borrower. First articulated by the United States Tax Court in Dean v. Commissioner, 35 T.C. 1083 (1961), this principle has since been accepted by five federal courts of appeal (the First, Second, Fourth, Fifth, and Sixth Circuit Courts). In a somewhat different factual context, the Ninth Circuit has also affirmed the holding in Dean. No circuit court has held that such a loan results in a taxable economic benefit. For the reasons set forth below, we decline to deviate from the long-standing precedent against treating such loans as a taxable event, and, consequently, we hold that the taxpayer here did not realize income from the receipt of his interest-free loans. Accordingly, we reverse.
 
 I FACTS
 
 2
 This is a suit under the Internal Revenue laws of the United States seeking refund of income taxes assessed against and collected from appellants, W.L. Hardee and Elnora L. Hardee, husband and wife, for the calendar years 1973 and 1974. Appellants are the principal shareholders of Sea Garden Sales Company, Inc. ("Sea Garden"), a closely-held corporation engaged in several business activities, including marine, industrial, and municipal supplies, farming and ranching, and the operation of a fleet of deep-sea shrimp trawlers. W.L. Hardee, the majority shareholder, was and is the president of Sea Garden and has served as director on the company's four-member board of directors. He owns approximately 52 percent of Sea Garden's stock, his wife owns approximately 42 percent, and his daughter and son-in-law own the remainder, roughly 6 percent. Since Elnora L. Hardee appears as a party solely because she filed a joint income tax return with her husband for the years in question, all references to taxpayer or appellant are to W.L. Hardee.
 
 
 3
 During the calendar years 1973 and 1974, appellant was indebted to Sea Garden, yet he was not obligated to pay, nor did he pay, any interest to Sea Garden on this indebtedness. Appellant's indebtedness during these years was the result of a company practice dating back to Sea Garden's inception in the mid-1950's whereby appellant deferred receipt of his salary until the end of the company's fiscal year (June 30th) and instead borrowed money, interest-free, from it from time to time. Appellant explained that he instituted this practice in order to enhance the company's asset posture during the year. Appellant maintained a running account with his company against which any loans would be charged and to which any repayments would be credited. At the end of its fiscal year, Sea Garden would credit appellant's salary to this account, and appellant would execute a bona fide promissory note (interest-free) for the balance still due the company. While Sea Garden occasionally made interest-free loans to other corporate employees, these loans were for much smaller amounts (e.g., $100) than those obtained by appellant.
 
 
 4
 By the end of 1972, appellant owed Sea Garden approximately $503,000. At the close of 1973, the first year in question, appellant's indebtedness to Sea Garden increased to about $595,000. The second year at issue ended with appellant owing about $474,000. During this 2-year period, Sea Garden was indebted to the First National Bank of Brownsville, Texas, for monies borrowed from time to time pursuant to a line of credit with the bank. Sea Garden's indebtedness ranged from $105,000 to $765,000, and while the loans were unsecured, appellant personally guaranteed them. The record, however, does not disclose the existence of any pattern or substantial connection between Sea Garden's borrowings from the Brownsville bank and appellant's own borrowings from Sea Garden, nor does the record enable the court to identify any certain relationship between Sea Garden's and appellant's borrowing needs. During 1973 and 1974, appellant also acted as the personal guarantor for more than $347,000 of outstanding indebtedness Sea Garden had incurred with the First National Bank of Harlingen, Texas, to finance the purchase of trawlers used in the company's shrimp operations, and which indebtedness was secured by collateral in the trawlers purchased with the loan proceeds.
 
 
 5
 Appellant's approximate net worth during the period in question was as follows:
 
 
 6
 December 31, 1972--$1,198,000
December 31, 1973--$1,223,000
December 31, 1974--$1,301,000
 
 
 7
 Before this period, appellant had invested a substantial amount of money in tax-exempt municipal bonds. By December 31, 1972, appellant held such bonds with a cost basis of about $534,000. By the end of 1973, he increased his holdings to a cost basis of about $600,000, yet by the end of 1974 he had decreased these holdings to about $546,000.
 
 
 8
 In reviewing appellant's tax liability for 1973 and 1974, the Commissioner asserted that as a result of the interest-free loans from his corporation, appellant had realized an economic benefit measured by the interest he would have been required to pay had he obtained the loans in an arm's-length transaction. Setting the interest rate at 7 percent (a figure appellant does not contest), the Commissioner increased appellant's gross income accordingly and assessed a deficiency of $24,926.61 for 1973 and $24,675.02 for 1974. Appellant paid the assessed deficiencies and sued for their recovery. The trial judge concluded that the value of the loans was properly includable in appellant's gross income for the years in question, but reserved judgment on quantum for later proceedings because the record did not establish the amounts and timing of the off-setting salary payments, and thus did not show the precise value of the loans.
 
 II OPINION
 
 9
 From the inception of our modern income tax laws in 1913 until Dean in 1961, the treasury never took the position that an interest-free loan by a corporation to its shareholder-officers resulted in the realization of income. During this period, the Internal Revenue Code has defined taxable income in broad and sweeping terms, yet the government did not see fit, either in litigation or by rule, regulation, or administrative practice, to treat such loans as a taxable event.
 
 
 10
 The first break in the government's stance occurred in Dean, where the Commissioner attempted to tax the value of the taxpayers' use of over $2 million dollars they borrowed interest-free from the corporation they controlled. The Tax Court held that those taxpayers realized no taxable income attributable to their receipt of the interest-free loans. The Commissioner did not pursue an appeal of this decision, nor did he announce his "nonacquiescence." For 12 years thereafter, the government reverted to the status quo, making no move to tax such recipients of interest-free loans.
 
 
 11
 At the end of 1973, after appellant here had completed the first of the two calendar years in question, the Commissioner finally stated his "nonacquiescence" to the 1961 Dean decision. 1973-2 C.B. 4. What then ensued can best be described as a losing campaign by the government in the federal courts to overrule or modify Dean. To date, the five United States courts of appeal considering this issue have rejected the government's position that interest-free loans by a corporation to its controlling shareholder result in a taxable gain. Parks v. Commissioner, 686 F.2d 408 (6th Cir.1982); Baker v. Commissioner, 677 F.2d 11 (2d Cir.1982); Beaton v. Commissioner, 664 F.2d 315 (1st Cir.1981); Martin v. Commissioner, 649 F.2d 1133 (5th Cir.1981); Suttle v. Commissioner, 625 F.2d 1127 (4th Cir.1980). In addition, the Ninth Circuit expressly affirmed Dean in order to hold that a preferential interest rate on a loan given by a lender in consideration for favorable news coverage in the borrower's newspaper, did not result in the realization of taxable income on the part of the borrower. Commissioner v. Greenspun, 670 F.2d 123 (1982).
 
 
 12
 In sum, it took the government nearly 50 years before it thought to treat the receipt of an interest-free loan as a taxable event, and over 20 years of case law has since held to the opposite view. In the case at bar, the trial judge recognized the long-standing precedent against the government's position, yet "with much hesitation" and "reluctance" he rejected the view of Dean and its progeny. Op. at 8. In reversing the decision of the trial judge, we do not disparage his economic analysis of the transaction. Rather, we follow the Dean holding because it represents a well-entrenched interpretation that has logical support. Even if logically assailable, such an interpretation should be changed by Congress, not the courts. In United States v. Byrum, 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972), the Supreme Court stated the approach courts should take when faced with an established principle of tax law:
 
 
 13
 * * * Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences. When a principle of tax law requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules lest they be subsequently overturned. Legislative enactments, on the other hand, although not always free from ambiguity, at least afford the taxpayers advance warning.
 
 
 14
 Of course, the Supreme Court has also warned against a mechanistic, slavish adherence to stare decisis:
 
 
 15
 We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.
 
 
 16
 [ Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940).]
 
 
 17
 In the case at bar, however, we are not simply adhering to a recent, questionable decision. The result we reach here is based on years of established precedent and administrative practice, and the transaction involved consists of a type of conduct that has historically not been viewed as resulting in tax consequences. We regard Byrum as controlling when we hold that Congress is better equipped than this or any court to alter the tax consequences of the conduct at issue.
 
 
 18
 The trial judge failed to give proper deference to the generally accepted interpretation of tax law, espoused by Dean and its progeny, that views the economic benefit a controlling shareholder-officer obtains when procuring an interest-free loan from his corporation as falling outside the definition of taxable income. The trial judge erroneously assumed that the basis for this view lies in the Dean court's discussion of the different tax treatment accorded the recipient of an interest-free loan and the recipient of in-kind benefits like the free use of an automobile. Although it did distinguish between these two borrowers, the Dean court was simply responding to an argument put forth by the government rather than furnishing the basis of its holding. The Tax Court thus pointed out that had a shareholder-officer paid for the use of a corporate automobile, he would not have received a deduction for this payment, while had the same person paid for the temporary use of corporate money (i.e., had he paid interest on a loan from his corporation), he would have received a deduction for the interest paid. The basis for this different tax treatment, however, is that the definition of taxable income was never intended to encompass the free, temporary use of corporate money by a majority shareholder-officer.
 
 
 19
 After rejecting the idea that our tax system would treat the economic benefit arising from the receipt of an interest-free loan differently than the benefit arising from the receipt of other in-kind benefits, the trial judge asserted that the prevailing case law evidently depends on
 
 
 20
 * * * the notion that, because interest obligations incurred in the marketplace give rise to deductions (in cases where a deduction is allowed) so also then should income-in-kind, when measured by the going rate of interest, carry with it the same tax consequences, to wit: a deduction. * * *
 
 
 21
 [Op. at 10-11.]
 
 
 22
 Put in another way, the trial judge stated that the "linchpin" of the prevailing view is "the idea that interest-free borrowings should stand on a parity, economically speaking, with borrowings in the marketplace." Op. at 7. According to the trial judge, the prevailing view seeks this parity because an interest-free borrower should not meet with tax consequences when he could have retained the same economic benefit while avoiding these consequences had he paid interest on the loan, increased his compensation from his controlled corporation to cover the interest payments, and then deducted the interest he paid.
 
 
 23
 As we stated above, however, the accepted interpretation of tax law supporting the Dean holding does not depend on the ability of a borrower to have structured a loan transaction in which interest is paid in such a way as to "wash out" his interest payments in order to attain the benefit of a nontaxed, interest-free loan. Rather, the accepted interpretation of the definition of taxable income does not encompass the benefit of such an interest-free loan in the first place. Thus, it is immaterial that no statutory authority exists for imputing a deduction for imputed interest payments, or that no statutory authority authorizes equal treatment for economically equivalent transactions when one of those transactions depends on the ability to deduct interest payments.
 
 
 24
 Since we hold that the definition of taxable income does not encompass the benefit a majority shareholder-officer gains by the receipt of an interest-free loan from his corporation, the possibility that this transaction would not be economically equivalent to the receipt of an interest-charging loan is beside the point. It was this possibility that prompted the very able Judge Goldberg, in his dissent in Martin, to propose an elaborate tax scheme that would eliminate the disparities that would result if a nontaxed, interest-free borrower could not have completely "washed out" interest payments, had he paid them, with a deduction. The government argues that here such a disparity would occur since appellant supposedly incurred his loans in order to carry tax-exempt municipal bonds; according to the government, had appellant paid interest on these loans, I.R.C. § 265(2) would have prohibited him from deducting these payments. Like the majority in Martin, however, we follow the Dean precedent that the use of funds from an interest-free loan does not constitute a taxable benefit, and therefore there is no need to require the economic equivalence of interest-free and interest-charging loan transactions or to adopt a scheme that accommodates the resulting disparities when such transactions are not economically equivalent. The government's further extrapolations of the tax consequences of not taxing an interest-free loan because of imputed deductions continue to miss the mark. Since we do not reach our result by imputing to the borrower an interest payment and a corresponding interest deduction, we are not theoretically constrained to impute interest income to the corporation.
 
 
 25
 This is not to say, therefore, that were we "writing on a clean slate" we would reach the result reached in Dean. Perhaps we would, perhaps not. It is not the situation that confronts us. It is, however, fair to say that we could never go so far as to regard Dean as plainly wrong, in any case. In this regard, it is appropriate to follow the example of the Claims Court judge, and state the objections to the position he contends for. From this it appears that, however full of fallacies the Dean opinion may be, they likewise and to the same degree infect the opposing position.
 
 
 26
 What is that opposing position? A court must always state the rule of law it relies on in reaching a decision. We let the Claims Court judge speak for himself, as he courageously does:
 
 
 27
 Undeniably then, the use of a corporate asset without a corresponding obligation to pay is an economic benefit--a gain expressed in money's worth--the value of which the tax law regards as income. That same result must apply so far as corporate funds are concerned for their use by a shareholder on an interest-free basis is certainly no less an economic enrichment of the borrower than, say, the rent-free use of a company-owned home or boat. * * *
 
 
 28
 [Op. at 10.]
 
 
 29
 Thus apparently, as the Claims Court judge states the "tax law," it makes no difference to what use the shareholder puts the corporate asset. He might (a) use the corporate asset to enhance his standard of living or that of his dependents, or (b) use it to bring in a monetary fruit. The latter possibility is peculiarly applicable to corporate funds, though it might occur if, e.g., the shareholder rented out a company-owned house instead of occupying it. In the event of a shareholder accruing taxable income from the corporate asset, the benefit from the free use would be reflected in and measured by the income received. As the law would tax that income, to tax the benefit also under the above-stated theory would be to tax the same thing twice. Yet the so-called "tax law" does not distinguish between the case stated and use of the corporate asset for personal comfort or to generate tax-exempt income. The "tax law" would not embody any means of avoiding a grossly unfair result.
 
 
 30
 Another difficulty is that the "tax law" as stated fails to take note of the fact that consideration for a loan of money often is furnished other than by paying interest. As a matter of fact, until recently, checking account depositors normally loaned money interest-free to their banks. They still loan money at much under going interest rates. It was never suggested that banks should pay income taxes on this "benefit," additional to the taxes they paid on the income earned by loan or investment of their depositor's funds. While in most cases banks were prohibited by law from paying interest on money deposited in demand accounts, such a proscription does not render this "benefit" (imputed income from interest not being paid) any less real or remove this "benefit" from the ambit of the Claims Court judge's statement of the "tax law." One reason for not requiring banks to pay taxes on this "benefit" no doubt is, when the relationship between the bank and the depositor was at arm's-length, it could be presumed that the value of services rendered to the depositor, other than interest, equaled what a fair rate of interest to a nondepositor lender would have been. If the depositor was not getting adequate consideration for an interest-free deposit he could take his money elsewhere. The bank did not obtain funds to loan or reinvest without paying any price. Something comparable in principle apparently occurred in the case at bar. Some part at least of the interest-free loans represented the value of salary earned by the taxpayer, but payment of which he chose to defer. The reason he did this was to make the balance sheet of the corporation look better at the end of its fiscal year. Also, he personally guaranteed the corporation's debts. In effect, he loaned a portion of his net worth and credit to the corporation in return for loan of some of its cash to him. The "tax law" as stated by the Claims Court judge would textually fail to take this reciprocal benefit into account, although his opinion reveals that he would reduce the loan amount by salary actually due. It seems to remain open just how, on remand, the amount due would be calculated.
 
 
 31
 While the exaction of interest has in recent years become much more general because of the prevailing high interest rates, it may be noted that until recently a credit retail customer was normally not required to pay interest on an account possibly many months overdue. This might have been considered an interest-free loan that should be taxed. In fact, the tax man looked the other way. No doubt he reasoned that the consumers who did not pay directly for use of money that properly belonged to their creditors, did so indirectly in higher prices for the things they purchased.
 
 
 32
 The proposition that any benefit-in-kind is income, obviously by its very nature, demands much judicial legislation to flesh it out in practical terms, unless that task is assumed by the legislative branch, or by the executive under proper delegation of legislative authority. The judiciary also has tried to help. Problems still remain, and legislative interventions have been frequent, as e.g., in the areas of employer-furnished meals (I.R.C. § 119; Commissioner v. Kowalski, 434 U.S. 77, 98 S.Ct. 315, 54 L.Ed.2d 252 (1977), or employer assumption of moving expenses when the employee moves from one duty station to another for the employer's convenience (I.R.C. §§ 82, 217). In the instance of interest-free loans, the authorities cited reflect an absolute judicial balk. The task of fleshing out the principle, if valid, that interest-free loans are a benefit that should be taxed as income, involves the framing of meticulous and carefully balanced rules. The judicial legislation proposed by the United States and to a less extent by the court below, would represent use of a meat axe where the appropriate instrument would be a scalpel. The authorities cited represent a so-far unanimous refusal by the judiciary to grasp the handle tendered, and we decline to break the unanimity.[1]
 
 
 33
 In conclusion, we hold that appellant's receipt of interest-free loans from his corporation does not result in taxable gain. To depart from the long-standing precedent against treating such loans as a taxable benefit would create uncertainty and would result in an uneven application of the tax law. For years people have been structuring their business transactions with respect to the expectation that the receipt of such loans would continue to fall outside the ambit of the I.R.C. § 61 definition of taxable income. With the exception of its stance in the 1961 Dean case, the government waited 60 years before indicating, with the Commissioner's announcement of his "nonacquiescence" at the end of 1973, that this expectation might not be warranted. Here, appellant had just completed the first of the 2 years in question when this announcement issued. In addition, appellant's debts to his corporation during these 2 years were the result of a practice he began in the mid-1950's and continued through the years. As the Second Circuit observed in Baker, Congress appears disinclined, at this point, to extend the reach of § 61 income beyond the point established by case law:
 
 
 34
 * * * No statutory guidelines have issued since [the 1973 nonacquiescence] to support the Government's position. Indeed, Congress has instructed the Commissioner not to issue new regulations in the area of fringe benefits until the end of 1983. See Pub.L. No. 95-427, § 1 (1978), extended by Pub.L. No. 96-167 (1979) and by section 801 of the Economic Recovery Tax Act of 1981, Pub.L. No. 97-34 (1981).
 
 
 35
 [677 F.2d at 12.]
 
 
 36
 The view that the receipt of interest-free loans is not a taxable event has been followed for such a period of time that it has hardened into a rule of law. Since this view is not grossly erroneous, the fact that counter-arguments can be made will not work to overturn the rule. It is now the prerogative of Congress, not that of the courts, to act on these arguments if it chooses.
 
 
 37
 REVERSED.
 
 
 38
 MARKEY, Chief Judge, dissenting.
 
 
 39
 With all respect, I dissent.
 
 
 40
 Courts owe a duty to avoid where possible the effective nullification of a statute, Adams v. Maryland, 347 U.S. 179, 181, 74 S.Ct. 442, 445, 98 L.Ed. 608 (1954), whether that result is reached in an initial decision or in the course of applying earlier court holdings.
 
 
 41
 The rationale of Dean v. Commissioner, 35 T.C. 1083 (1961), was that an interest-free loan resulted in no taxable gain because the interest which would otherwise have been paid would be deductible. A statute, 26 U.S.C. § 265(2) (Supp. V 1981), provides that interest paid on a loan the proceeds of which were used to purchase or carry tax-exempt bonds is not deductible. Whatever may have been said of Dean in subsequent court opinions, I am persuaded that Dean is simply inapplicable to a situation in which interest payments if they had been made would not have been deductible.
 
 
 42
 I am further persuaded that an interpretation of Dean which stops with the conclusion that an interest-free loan results in no taxable gain, coupled with an application of that interpretation to the facts of this case, would effectively nullify section 265(2) with respect to every taxpayer able to acquire interest-free loans for the purchase or carrying of tax-exempt bonds.
 
 
 43
 As so ably stated by Judge Kashiwa, the Hardees failed to carry their burden here of establishing that the proceeds of their interest-free loans were not used to carry their tax-exempt bonds.
 
 
 44
 I agree, of course, with much of what is said in the majority opinion respecting the need to follow established case law, the appropriateness of deferral to Congress for changes therein, and the undue breadth of the trial judge's comments on in-kind benefits.
 
 
 45
 As above indicated, however, I view Dean as simply inapplicable to the case before us. An affirmance here on the foregoing basis would therefore leave intact the holdings in Dean and in other cases that did not involve the purchase or carrying of tax-exempt obligations. I would honor both Dean and section 265(2) by holding that the interest-free loans in this particular case resulted in taxable gain.
 
 
 46
 KASHIWA, Circuit Judge, dissenting.
 
 
 47
 I respectfully dissent.
 
 
 48
 The majority today holds what no court before it has ever held, that "the definition of taxable income was never intended to encompass the free, temporary use of corporate money by a majority shareholder-officer." It is not exactly clear how the majority arrives at its conclusion. It appears to be on the basis of some sort of mix of concepts of stare decisis, application of laches against the Government, concerns over double taxation where there is none, and misinterpretation of prior case law. The majority fails to recognize that the issue before us is one of first impression not only for us but for all courts. That issue is whether a taxpayer realizes income when he continues an interest-free loan for purposes of carrying tax-exempt obligations.[1] The action of the majority creates by judicial fiat a new tax loophole that is not supported by the Internal Revenue Code of 1954, as amended (26 U.S.C., hereinafter Code). It is an unwarranted extension of Dean v. Commissioner, 35 T.C. 1083 (1961) and its progeny. I would affirm the result reached by Judge Wiese (i.e., that appellant realizes income when he receives and continues interest-free loans) but on a different, narrower ground. I do not reach the issue whether all interest-free loans result in the recognition of income. I would simply hold that a taxpayer who continues an interest-free loan for the purpose of carrying tax-exempt bonds recognizes income.
 
 
 49
 * The majority cloaks itself in the doctrine of stare decisis, citing United States v. Byrum, 408 U.S. 125, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972), and as a result has failed to examine the facts. The majority would wish us to believe that all courts are bound by an interpretation of tax law that has existed for a number of years on the premise that certainty is required in the field of taxation. Byrum, however, rested upon far more than the desire for certainty; it carefully analyzed the statute involved and rested its decision on the interpretation of that statute. Moreover, that decision was in the field of estate taxation where the necessity for long-range planning causes a particular desire for certainty.
 
 
 50
 The majority "regard[s] Byrum as controlling," although that case bears no resemblance to the facts before us. The Supreme Court in cases involving the income tax field, as opposed to estate tax, has overruled well-established precedents where it was believed that the precedents, though of long duration, were in error.
 
 
 51
 In Commissioner v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956) the Court overruled 18 years of settled tax law concerning the income tax consequences of the receipt of a stock option by an employee from an employer in exchange for less than fair market value.[2] In response to the argument that the decision upset years of settled tax law, Justice Black simply responded:
 
 
 52
 In our view there is no statutory basis for the test established by the courts below.
 
 
 53
 351 U.S. at 247, 76 S.Ct. at 803.
 
 
 54
 In yet another tax decision, Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940), Justice Frankfurter, writing for the majority made a statement that is most apt to the facts before us:
 
 
 55
 We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 Nor does want of specific Congressional repudiations * * * serve as an implied instruction by * * * Congress to us not to reconsider * * * those decisions * * *. It would require very persuasive circumstances enveloping Congressional silence to debar this Court from reexamining its own doctrines. To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities. * * * But certainly such inaction by the Treasury can hardly operate as a controlling administrative practice, through acquiescence, tantamount to an estoppel barring reexamination by this Court of distinctions which it had drawn. Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of the Treasury and of Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.
 
 
 59
 This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction. [Footnotes omitted, emphasis added.]
 
 
 60
 Id. at 119-121, 60 S.Ct. at 451-52.
 
 
 61
 Thus, there is simply no doctrine of estoppel against the government for its failure to contest the income tax consequences of interest-free loans at an earlier date. This court cannot blindly follow the Dean decision. It must make its own independent examination of the facts before it. To do otherwise is to shirk its basic judicial responsibilities.
 
 II
 
 62
 After making a careful examination of the facts in the instant case and reviewing basic precepts of tax law as embodied in the Code and case law, I find that a taxpayer who continues an interest-free loan for the purpose of carrying tax-exempt bonds realizes income. I find it unnecessary on the facts before us to make any judgment as to the correctness of the Dean decision for I find that case inapplicable.
 
 
 63
 The majority claims that Dean and its progeny held the view that "the economic benefit a controlling shareholder-officer obtains when procuring an interest-free loan from his corporation * * * fall[s] outside the definition of taxable income." It attempts to dismiss the Tax Court's discussion in Dean of "the different tax treatment accorded the recipient of an interest-free loan and the recipient of in-kind benefits" as a mere response to the Government's argument. In doing so the majority fails to appreciate the Dean holding. Dean differentiates an interest-free loan from the conferral of other kinds of benefits which are taxable to an employee/shareholder on the basis that:
 
 
 64
 [H]ad petitioners borrowed the funds in question on interest-bearing notes, their payment of interest would have been fully deductible by them under section 163, I.R.C. 1954. Not only would they not be charged with the additional income in controversy herein, but they would have a deduction equal to that very amount. We think this circumstance differentiates the various cases relied upon by the Commissioner.
 
 
 65
 35 T.C. at 1090.
 
 The opinion then says:
 
 66
 We think it to be * * * true that an interest-free loan results in no taxable gain to the borrower. [Emphasis added.]
 
 
 67
 Id. Dean therefore did not hold that an interest-free loan fell outside the definition of taxable income but that the presence of the section 163 interest deduction caused the loan to "result in no taxable gain to the borrower."[3] It must also be observed that the concurring opinion of Judge Opper, joined by three other judges, said that the statement that "an interest-free loan results in no taxable gain to the borrower" was too broad a generalization.[4] Though the concurring opinion agreed with the result in Dean as applied to the facts of that case, it noted that other factual situations would lead to different results. The concurrence specifically stated that it would be a different case if:
 
 
 68
 [T]he facts showed that the indebtedness was "incurred * * * to purchase or carry obligations * * * the interest on which is wholly exempt from * * * taxes." Sec. 265(2), I.R.C. 1954.
 
 35 T.C. at 1091.[5]
 
 69
 Thus as early as 1961 taxpayers, including the appellant, should have been aware that the Dean decision might not apply if they chose to carry tax-exempt obligations while incurring or continuing an interest-free loan. Taxpayers could not be certain what decision a court would reach if they chose to embark upon such a course of action. There was no cause for taxpayer reliance.
 
 
 70
 The majority ignores the subsequent review of the Dean decision by the full Tax Court in Greenspun v. Commissioner, 72 T.C. 931 (1979). That review affirmed the Dean decision but resulted in an analysis of Dean that is contrary to the analysis of Dean proposed by the majority. Accord Zager v. Commissioner, 72 T.C. 1009, 1012 (1979). The Tax Court in Greenspun said:
 
 
 71
 In holding that no income was realized by the taxpayers in Dean, however, we reasoned that had the taxpayers borrowed the funds on interest-bearing notes, their payment of interest would have been fully deductible under section 163. Underlying this reasoning was the idea that, economically speaking, an interest-free loan from a corporation to its shareholder or employee is in substance no different from the making of a loan on which interest is charged accompanied by an increase in dividends or compensation in an amount equal to the interest charged. Consequently, to give effect to the economic reality of the situation, we attempted in Dean to equalize the tax treatment of the two loan transactions.
 
 
 72
 Id. at 947-948. Thus, the Tax Court attempted to accord similar tax treatment to what it perceived were economically equivalent transactions. It recognized, however, that not every loan transaction would have the same economic consequences as the hypothetical posed:
 
 
 73
 For instance, in not all cases does the payment of interest give rise to a deduction under section 163. The most notable limitation in this regard is found in section 265(2) which prohibits a deduction for interest paid on indebtedness incurred to purchase or carry obligations, the interest income from which is exempt from tax. Failing to give recognition to this fact could possibly create a situation which would unfairly favor the making of interest-free loans.
 
 
 74
 Id. at 948-949.
 
 
 75
 The court then considered the case of A, a shareholder/employee who invests the proceeds of a $20,000 loan from X Company in securities that yield $1,000 of tax-exempt interest income per year. If A's loan from X Company is interest free and the Dean decision applies, A will recognize no taxable income at year's end. If, however, A is paid a salary of $1,000 and charged $1,000 of interest on the loan, A would have $1,000 of gross income but would be unable to deduct his interest payment by virtue of section 265(2). As the Tax Court said:
 
 
 76
 The end result is that X Co. in granting the loan interest-free has enabled A to effectively convert $1,000 of taxable compensation into $1,000 of tax-exempt interest income.
 
 
 77
 * * *
 
 
 78
 * * *
 
 
 79
 [I]n certain cases our solution of equating the two loan transactions, as demonstrated above, may result in a wide disparity in the tax treatment of the two situations. When and if we are confronted with such a case, we will decide at that time whether Dean is applicable, and if so, whether we shall continue to adhere to our decision in Dean. [Footnote omitted].
 
 
 80
 Id. at 949-950.
 
 
 81
 Greenspun makes it plain that Dean did not hold that an interest-free loan falls outside the definition of taxable income and that the presence of the section 163 interest deduction is critical to the Dean analysis.[6]
 
 
 82
 Therefore, the Tax Court has not decided, nor has any other court, whether a taxpayer who continues an interest-free loan for the purpose of carrying tax-exempt bonds realizes income. See Beaton v. Commissioner, 664 F.2d 315, 317 (1st Cir.1981) ("The [tax] court also noted that in certain cases its approach of equating the interest-free loan with an interest-bearing note in certain circumstances 'may result in a wide disparity in the tax treatment of the two situations.' * * * The court stated that when and if it was confronted with such a situation, it would at that time decide whether to modify its decision in Dean. * * * Greenspun was not such a case and neither is the one at bar."); Baker v. Commissioner, 677 F.2d 11, 13 (2d Cir.1982) (The court examined Judge Goldberg's dissent in Martin v. Commissioner, 649 F.2d 1133, 1134 (5th Cir.1981), which advocated having a taxpayer report imputed interest on an interest-free loan as income and then deduct the amount to which, depending on the various deductibility provisions of the Code, a taxpayer would actually be entitled to, and said, "[w]e need not accept or reject Judge Goldberg's approach in this case, however, as the taxpayer here could have deducted the interest that the I.R.S. seeks to impute to him as income.") Cf. Martin v. Commissioner, supra (Goldberg, J., dissenting).
 
 III
 
 83
 Having determined that Dean does not govern a case where a taxpayer continues an interest-free loan for the purpose of carrying tax-exempt bonds, I must now decide whether appellant continued his interest-free loans for this purpose. Although the trial judge based his decision upon the broader question whether income must be recognized for all interest-free borrowings, a full trial was held on the tax-exempt issue and complete fact findings were made by the trial judge on this issue. See Hardee v. United States, 82-2 U.S.T.C. p 9459, 84,656 footnote; 50 AFTR 2d 82-5252, 8253 footnote. The facts found by the trial judge were appropriately detailed and specific. For our purposes the following brief summary will be sufficient.
 
 
 84
 Appellant is the majority stockholder in Sea Garden Sales Company, Inc. Members of appellant's family own the remaining stock in the corporation. It is appellant's long standing practice to take interest-free loans from Sea Garden. Appellant's secretary kept track of his personal bank account, and when she determined that available funds were inadequate to meet anticipated disbursements, she would alert appellant to the need for additional monies. He then would obtain replenishment funds from Sea Garden by causing the company, directed solely on the basis of appellant's own decision in the matter, to extend a loan to him. The loan proceeds so obtained would be deposited in appellant's personal bank account, and the amount borrowed charged against a running account which appellant maintained with Sea Garden.
 
 
 85
 During the years at issue, 1973 and 1974, appellant had substantial investments in tax-exempt municipal bonds. The value of these holdings "at cost" were as follows:
 
 
 86
 Date Cost Basis of
 Municipal Bonds
----------------- ---------------
December 31, 1972 $534,113.96
December 31, 1973 600,802.00
December 31, 1974 546,740.00
 
 
 87
 The amount of appellant's indebtedness to his corporation Sea Garden during the same periods as reflected by the promissory notes, accounting records, and financial statements was:
 
 
 88
 Date Total Indebtedness
----------------- ------------------
December 31, 1972 $503,542.07
June 30, 1973 350,578.70
December 31, 1973 595,510.66
June 29, 1974 349,072.13
December 31, 1974 474,199.63
 
 
 89
 Appellant maintained in interrogatories that because of the existence of income from other sources, it is "impossible to determine whether the proceeds of a cash advance from the Company to the taxpayer, or any part of a cash advance, was used by the taxpayer to acquire [tax-exempt] bonds * * *." In his testimony, however, appellant acknowledged that there were occasions when his purchase of tax-exempt bonds had generated a corresponding need to borrow funds from Sea Garden. There were no legal sales restrictions which would have prevented appellant from liquidating his tax-exempt investments during 1973 and 1974. Appellant testified that such a liquidation would have resulted in a financial loss to him.
 
 
 90
 The attached tables in the Appendix indicate the assets and liabilities of appellant during the years 1972 through 1974.
 
 In conclusion the relevant facts are:
 
 91
 1. The cost basis of appellant's tax-exempt obligations during the years in question exceeded the amount of appellant's debt to Sea Garden.
 
 
 92
 2. All loan proceeds from Sea Garden were deposited in appellant's personal bank account and new funds were borrowed on appellant's authority alone when the funds in his personal bank account became low. No business use for the funds borrowed was claimed by appellant.
 
 
 93
 3. The only reason given for appellant's failure to liquidate his tax-exempt holdings to pay off his indebtedness to Sea Garden was that such action would result in a financial loss to him.
 
 
 94
 Section 265(2) of the Internal Revenue Code provides for a limitation upon the interest deduction ordinarily allowed by the Code. See section 163, n. 3, supra. This limitation is of long duration, having first been introduced into the Code by the Revenue Act of 1918 and continued in similar form since that time. It provides:
 
 
 95
 § 265. Expenses and interest relating to tax-exempt income
 
 
 96
 No deduction shall be allowed for--
 
 
 97
 * * *
 
 
 98
 * * *
 
 
 99
 (2) Interest.--Interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this subtitle.
 
 
 100
 Congress in this section evinced a concern that taxpayers not be allowed the double benefit of having income excluded from taxation and at the same time granting a deduction for funds that enabled the taxpayer to earn that tax-exempt income. See Denman v. Slayton, 282 U.S. 514, 51 S.Ct. 269, 75 L.Ed. 500 (1931). To meet the qualifications of section 265(2) it need only be shown that interest on indebtedness was continued to carry tax-exempt obligations; no tracing of funds need be shown. Illinois Terminal R.R. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (Ct.Cl.1967); Bishop v. Commissioner, 41 T.C. 154, aff'd, 342 F.2d 757 (6th Cir.1965).
 
 
 101
 It is well established that a finding of the Commissioner is entitled to a presumption of correctness. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Further, a taxpayer seeking a deduction bears the burden of proof to establish his entitlement to that deduction. Reinecke v. Spalding, 280 U.S. 227, 232-233, 50 S.Ct. 96, 97-98, 74 L.Ed. 385 (1930); Burnet v. Houston, 283 U.S. 223, 227, 51 S.Ct. 413, 414, 75 L.Ed. 991 (1931); Botany Worsted Mills v. United States, 278 U.S. 282, 289-290, 49 S.Ct. 129, 131-32, 73 L.Ed. 379 (1929); Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420, 423 (7th Cir.1968); Bishop v. Commissioner, supra. Although
 
 
 102
 a taxpayer is not automatically required to liquidate [tax-exempt] * * * obligations to obtain needed funds rather than retain such obligations and obtain those funds by way of independent borrowing, Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420, 423 (C.A.7, 1968); Norfolk Shipbuilding & Drydock Corp. v. United States, 321 F.Supp. 222 (E.D.Va.1971); Edmund F. Ball, 54 T.C. 1200 (1970)[;] * * * it is equally clear that a taxpayer cannot insulate himself from the prohibition of section 265(2) by merely juggling the use of his available assets so as to create a surface sanitation of the indebtedness from the acquisition or holding of the tax-exempt obligations. Illinois Terminal Railroad Co. v. United States, 375 F.2d 1016 [179 Ct.Cl. 674] (Ct.Cl.1967); Constance M. Bishop, 41 T.C. 154 (1963), affd. 342 F.2d 757 (C.A.6, 1965).
 
 
 103
 The touchstone for decision is the purpose of the taxpayer in incurring or continuing the indebtedness and the burden of proof is on the petitioner.
 
 
 104
 Indian Trail Trading Post, Inc. v. Commissioner, 60 T.C. 497, 500 (1973), aff'd, 503 F.2d 102 (6th Cir.1974).
 
 
 105
 Purpose may be inferred from the conduct of the taxpayer and the circumstances therein. Indian Trail Trading Post, supra; Leslie v. Commissioner, 50 T.C. 11, 20-21 (1968), rev'd on other grounds, 413 F.2d 636 (2d Cir.1969).
 
 
 106
 Prior cases demonstrate that only certain purposes for incurring or continuing a debt will enable a taxpayer to avoid the prohibition of section 265(2) when he carries tax-exempt obligations. Such permissible purposes for incurring or continuing a debt include mortgages and business reasons. See, e.g., Investors Diversified Services, Inc. v. United States, 575 F.2d 843 (Ct.Cl.1978); Illinois Terminal R.R. v. United States, supra; Wisconsin Cheeseman, Inc. v. United States, supra. In addition, if the tax-exempt obligations are not salable, the bar of section 265(2) will not be invoked. Wisconsin Cheeseman, 388 F.2d at 422.
 
 
 107
 Proof of other purposes for incurring or continuing a loan have not sufficed. For example, in McDonough v. Commissioner, 577 F.2d 234 (4th Cir.1978) taxpayers paid interest on brokerage margin accounts through which only taxable securities were bought and sold. During the same period taxpayers owned tax-exempt securities that were purchased with cash and were never pledged as collateral. In addition, they paid interest on short-term bank loans which were used primarily to pay income taxes. The tax-exempt securities were held separately from the brokerage accounts for taxable securities. The Commissioner applying the formula of Rev.Proc. 72-18, 1972-1 C.B. 740, 743, denied part of the deduction. The Fourth Circuit in affirming that action said:
 
 
 108
 The purpose for incurring indebtedness must be determined from all the relevant circumstances. The taxpayers advanced no explanation for not liquidating their tax-exempt holdings to reduce their indebtedness other than their desire to maintain a portfolio of both taxable and tax-exempt securities and to make the maximum use of the money invested in taxable securities. Therefore, we find no error in the Tax Court's ruling that the taxpayers failed to prove that they did not incur or continue the indebtedness to purchase or carry their tax-exempt securities within the meaning of § 265(2). Cf. Israelson v. United States, 367 F.Supp. 1104 (D.Md.1973), aff'd, 508 F.2d 838 (4th Cir.1974).
 
 
 109
 Id. at 235-36. It was not sufficient that taxpayers demonstrated their margin accounts were used solely for the purpose of acquiring taxable securities and their temporary need of a loan to pay income taxes. Section 265(2) was held to apply although there was no direct relation between the loans and the tax-exempt securities.
 
 
 110
 Similarly, the Eighth Circuit in Levitt v. United States, 517 F.2d 1339 (8th Cir.1975), held that section 265(2) applied. In that case taxpayers claimed an interest deduction for loans carried to finance the purchase of taxable United States treasury bonds. At all times taxpayer could have paid off her loans by liquidating her holdings of tax-exempt municipal bonds. The treasury bonds in question were purchased for the purpose of reducing the amounts which taxpayers' estates would pay in estate taxes. No independent business reason was advanced for the purchase of the treasury bonds. The court said:
 
 
 111
 The fact that the borrowing may have been advantageous for federal estate tax purposes does not evidence a purpose unrelated to the taxpayers' purchase and holding a [sic] tax-exempt securities. Rather the absence of any adequate business justification for the loans compels the conclusion that the taxpayer borrowed money in order to retain his or her tax-exempts.
 
 
 112
 Id. at 1344-1345.
 
 
 113
 A third case this court should be cognizant of is Bishop v. Commissioner, supra. Petitioner there argued, as taxpayers here do, "that since the loan was not secured by tax-exempt securities and all purchases were made from commingled funds in her agency account, the provisions of section 265(2) are inapplicable to her loan," 41 T.C. at 159. In response the Tax Court said:
 
 
 114
 The purpose of section 265(2) is to prevent the escape from taxation of income properly subject thereto by the purchase of tax-exempt securities with borrowed money. Denman v. Slayton, 282 U.S. 514 [51 S.Ct. 269, 75 L.Ed. 500] (1931). The purpose of this section would be too easily frustrated if a borrower could avoid its impact by the simple expedient of buying non-tax-exempt securities with the borrowed funds, then selling those securities and using the proceeds of the sale to purchase tax-exempt securities instead of repaying the loan.
 
 
 115
 Id. at 161. And, as the Court of Claims said in Illinois Terminal Railroad Co., supra:
 
 
 116
 [P]laintiff is in error, for by assuming that funds from the loan in question must be traceable to the cost of the bonds, it fails to distinguish between "incurred * * * to purchase" and "continued * * * to carry." That assumption eviscerates the meaning of the terms "continued" and "carry," which expand the application of Section 265(2) beyond the possibly narrow limits of "incurred" and "purchase."
 
 
 117
 375 F.2d at 1020.
 
 
 118
 In summary, first, section 265(2) applies to bar the deduction of interest paid on a loan where that loan is taken or continued for the purpose of purchasing or carrying tax-exempt obligations. Second, that purpose is determined by an examination of all the facts and circumstances. Last, the taxpayer, not the government, bears the burden of proof.
 
 
 119
 In the case now before us the appellant-taxpayer has failed to meet his burden of proof. The Government has demonstrated the basis for its application of section 265(2), i.e., that all loan funds were deposited in appellant's personal bank account at his own direction when his secretary determined that his personal funds were low. Thus the circumstances infer that the loans were incurred for personal purposes. The appellant has failed to refute this. He instead argues that because of the existence of income from other sources, it is "impossible to determine whether the proceeds of a cash advance from the Company to the taxpayer, or any part of a cash advance, was used by the taxpayer to acquire [tax-exempt] bonds * * *."
 
 
 120
 This argument does not help appellant, for as discussed, the Government has no burden to trace funds. The only rationale appellant presents for maintaining his tax-exempt investments and interest-free loans is that liquidation of those investments would have resulted in economic loss. This is not a valid reason to prevent the bar of section 265(2) from applying. Lastly, appellant claims his case is "virtually identical" to Baker v. Commissioner, 75 T.C. 166 (1980), aff'd, 677 F.2d 11 (2d Cir.1982). This simply is not true. In Baker due to the factual situation the court failed to reach the question whether the Dean rationale should apply when section 265(2) applies. The court there found section 265(2) did not apply. In Baker the parties had stipulated that the money borrowed from the corporation was used to make estimated tax payments. The Tax Court found this purpose bore no nexus to the purchase of tax-exempt obligations and was legitimate. Further, there was a serious question whether this issue had been raised in a timely manner. Thus, Baker is factually different from the case before us and did not reach the issue we must decide, whether the application of section 265(2) affects the Dean doctrine.
 
 
 121
 Since section 265(2) has been shown to apply to the facts before us, had appellant's loan been an interest-bearing one, he would not have been able to deduct the interest on the loan. Thus the rationale of the Dean decision, that the tax treatment of interest-free loans differs from the tax treatment of other benefits received by a shareholder/employee from his corporation/employer due to the application of the section 163 deduction, does not apply.
 
 IV
 
 122
 Since section 265(2) bars an interest deduction in this case, the benefit conferred on appellant when he was given the interest-free use of money cannot be differentiated from the conferral of other in-kind benefits. When the majority claims "the definition of taxable income was never intended to encompass the free, temporary use of corporate money by a majority shareholder/officer," it ignores well-established precedent concerning section 61 of the Code. Section 61 provides in pertinent part:
 
 
 123
 § 61. Gross income defined
 
 
 124
 (a) General definition --Except as otherwise provided in this subtitle, gross income means all income from whatever source derived * * *.
 
 
 125
 It is well settled that Congress in enacting section 61 and its predecessors intended "to exert * * * the full measure of its taxing power." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955), quoting Helvering v. Clifford, 309 U.S. 331, 334, 60 S.Ct. 554, 556, 84 L.Ed. 788 (1940). See also Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216, 223, 57 S.Ct. 423, 425, 81 L.Ed. 612 (1937); Douglas v. Willcuts, 296 U.S. 1, 9, 56 S.Ct. 59, 62, 80 L.Ed. 3 (1935); Irwin v. Gavit, 268 U.S. 161, 166, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925). It is the "intention of Congress to tax all gains except those specifically exempted." Glenshaw Glass, 348 U.S. at 430, 75 S.Ct. at 476. Gains encompass more than the receipt of cash, they also encompass the value of in-kind benefits. Commissioner v. Smith, 324 U.S. 177, 181, 65 S.Ct. 591, 593, 89 L.Ed. 830 (1945). Cases taxing the value of in-kind benefits are legion and of longstanding. See, e.g., Gardner v. Commissioner, 613 F.2d 160 (6th Cir.1980) (income recognized in the rent-free use of a company-owned automobile); Chandler v. Commissioner, 119 F.2d 623 (3d Cir.1941) (income recognized in the free use of a corporation-owned residence); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650 (1962) (income recognized in the rent-free use of a company-owned boat); Frueauff v. Commissioner, 30 B.T.A. 449 (1934) (income recognized in the rent-free use of a company-owned apartment). It is easy to see how the value of in-kind benefits are income if we compare the in-kind transaction to one that is in substance the same. If a shareholder/employee were to rent a residence and the corporation gave the shareholder/employee the money with which to pay the rent, the conferral of money upon the shareholder/employee would be income. The taxation of in-kind benefits by Congress and the courts prevents the circumvention of the recognition of income. The recognition of income in the abovementioned hypothetical cannot simply be avoided by letting the shareholder/employee use a residence rent free.
 
 
 126
 In the case before us, Sea Garden allows its majority shareholder, appellant, the use of substantial amounts of money without payment of interest. This is an in-kind benefit. Had appellant instead taken an interest-bearing loan from a third party and had Sea Garden paid the interest on that loan, that would be income to appellant. See Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929) (corporation's payment of employee's taxes is income to the employee). Sea Garden has instead given this very same benefit, the free use of money, in-kind. This in no way changes the fact that a taxable benefit has been conferred on appellant.
 
 
 127
 As discussed in part II, supra, Dean and Greenspun have not taxed this benefit for equitable reasons based upon the effect of the section 163 interest deduction allowed by Congress. As demonstrated in part III, supra, the application of that section is barred on the facts before us because of section 265(2). Since there can be no interest deduction in this case, the in-kind benefit, the free use of money given appellant must be taxed as any other benefit. There are simply no equitable reasons not to tax this benefit and indeed, there is an excellent reason we should do so. Had appellant taken an interest-bearing loan and used the loan funds to maintain his tax-exempt holdings, he would have been forbidden by section 265(2) from deducting the interest on that loan. To ignore the application of section 265(2) to the instant case, as the majority does, is to flout the Congressional will that taxpayers not receive the double benefits of income exclusion and tax deduction in a section 265(2) situation. The majority has created a judicial exception to sections 61 and 265(2), something the courts are not able to do.
 
 V
 
 128
 The majority discusses at length some problems it sees with the taxation of the free use of corporate monies by appellant. First, it claims that the taxation of in-kind benefits, particularly under the facts of this case could result in "tax[ing] the same thing twice * * * a grossly unfair result." Indeed, if this were true it would be unfair. Taxation of in-kind benefits, however, does not result in double taxation. If one takes out a $1,000 loan at 10% interest and the corporation he works for pays the 10% interest for him, that payment of interest is income to him. If he then invests the $1,000 and earns interest on it, that interest he earns is a separate benefit that is also income. There is no taxation of the same thing twice. Now suppose the corporation he works for lets him use $1,000 for the year interest free. That is an income benefit just as the payment of interest by the corporation was. If he earns interest on the $1,000, that is an accretion to wealth that is separate and distinct from the free use of the money. There again is no problem of double taxation.
 
 
 129
 Second, the majority expresses concern that checking accounts on which no interest is earned are interest-free loans that should, accepting the trial judge's theory, be subject to tax. What the majority fails to realize is that banks provided services for the use of the depositor's money, i.e., checking services and the safekeeping of the money. Moreover, it cannot be forgotten that banking transactions are arm's-length transactions that cannot be equated to the transactions between a majority shareholder and his controlled corporation. The majority accepts the testimony that appellant's choice to borrow and defer salary was done to benefit his company and seems to imply it was done at some sacrifice to appellant. It does not realize that this process was really self-serving. If appellant called the money he received from Sea Garden a loan rather than salary, he did not have to pay income tax on it. Appellant in his position as sole shareholder could recharacterize the loan as salary at will when, for example, he had deductions he could take advantage of. The company's asset posture in reality would not have been enhanced by these transactions. Although the company had an account receivable for appellant's loan, it also should have had the salary owed appellant listed as a liability and fewer actual dollars in its account. I would argue that appellant was "playing games" with his company's books and to the extent these so-called loans were in reality salary that was owed, they should be recognized as salary and income upon receipt of the actual dollars by appellant.
 
 
 130
 Third, the majority states that treatment of the loan in the instant case would create uncertainty and would result in an uneven application of the tax law. My result in this case is quite narrow. I can only judge the case on the facts before us and would hold that where section 265(2) bars an interest deduction, an individual must recognize as income the benefit he receives from an interest-free loan. No court has dealt with these particular facts before and thus, no uneven application of the tax laws can result.
 
 
 131
 Fourth and last, the majority argues that the Congressional delay on the issuance of new treasury regulations concerning fringe benefits has some application to the courts. It is clear, however, that this applies only to the Internal Revenue Service and not the courts. The action I would take today is not as the majority characterizes it an extension of the "reach of section 61 income beyond the point established by case law," but simply the recognition of what was established long ago, that section 61 taxes all gains except those specifically exempted.[7] Glenshaw Glass, supra.VI
 
 
 132
 In conclusion, I would hold that due to the disallowance of the interest deduction by section 265(2), appellant must recognize as income the value of the free use of the monies loaned. The prior case law did not concern a situation where section 265(2) applied and appellant therefore had no cause to think the transactions he undertook were nontaxable.
 
 APPENDIX
 
 133
 NOTE--Some parts of this form are wider than one screen. To view
 
 
 134
 material that exceeds the width of this screen, use the right arrow
 
 
 135
 key. To return to the original screen, use the left arrow key.
 
 
 136
 TABLE I
 -------
 Assets of W.L. Hardee as of December 31, 1972-74
 ------------------------------------------------
 (Shown by dollar amount and as a percentage of total assets)
 1972 1973 1974
 ---- ---- ----
Current Assets
--------------
 Cash and Accounts
 Receivable $ 26,851.16 ( 1.53%) $ 30,628 ( 1.67%) $ 27,584 ( 1.53%)
Investments
-----------
 Municipal Bonds 534,113.96 (30.44%) 600,802 (32.68%) 546,740 (30.28%)
 Corporate Stocks 292,052.00 (16.64%) 320,198 (17.42%) 333,620 (18.48%)
 Stock of Controlled 193,896.55 (11.05%) 190,335 (10.35%) 189,507 (10.50%)
 Corp.
Fixed Assets
------------
 Real Estate
 (unimproved) 640,000.00 (36.47%) 640,000 (34.81%) 640,000 (34.45%)
 Rental Property 8,249.99 ( .47%) 973 ( .05%)
Other Assets
------------
 Real Estate
 Mortgage and 22,283.21 ( 1.27%) 17,961 ( .98%) 30,489 ( 1.69%)
 Contracts
 Notes Receivable 37,387.96 ( 2.13%) 37,453 ( 2.04%) 37,520 ( 2.08%)
 TOTAL $1,754,834.83 $1,838,350 $1,805,460
 
 
 137
 TABLE II
 --------
 Liabilities and Net Worth of W.L. Hardee as of December 31, 1972-74
 (Shown by dollar amount and as a percentage of total assets)
 1972 1973 1974
 ---- ---- ----
Current Liabilities
-------------------
 Federal Income
 Tax Payable $ 28,848.42 ( 1.64%) $ 5,759 ( .31%) $ 15,812 ( .88%)
 Real Estate Deposits $ 24,250.00 ( 1.38%) $ 13,750 ( .75%) $ 13,750 ( .76%)
Long Term Liabilites
--------------------
Due to Sea Garden $ 503,542.07 (28.69%) $ 595,511 (32.39%) $ 474,200 (26.26%)
 Sales Company, Inc.
Net Worth
---------
 W.L. Hardee $1,198,194.36 (68.28%) $1,223,330 (66.54%) $1,301,698 (72.10%)
 
 
 
 *
 Pursuant to order of this court dated October 4, 1982, Judge Wiese entered a final judgment on October 8, 1982, corresponding to the decision recommended in the case
 
 
 [1]
 The able dissents herein say that this case falls outside the Dean rule because the taxpayer incurred his debts to the corporation to carry tax-exempt bonds. This is not the rule stated and followed by the trial judge and would, if adopted, pronounce a limitation on the Dean rule not hitherto espoused by any court, so far as we have learned in our research. The courts invariably have disregarded or declined to reach the question of the effect to be given the taxpayer's use of the money. The sole exception is the Goldberg dissent, supra, and that did not prevail even with that panel. Nor has any attempt been made to measure what the deduction for supposititious interest would have been, or how closely it would have matched the tax proposed on the imputed income. The trial judge found facts that might have supported a factual conclusion that some parts of the debt were to carry tax exempts, though not all, as other parts were mere anticipations of salary earnings, and as the loans could be viewed as extended, in part, in consideration for taxpayer's personal guaranty of the corporation's debts. The trial judge did not himself find that any part was so used. He was writing for the old Court of Claims, whose judges were also fact finders, and might have themselves found the ultimate facts suggested to them by the record. We are not fact finders, being appellate judges. The most we could do, if the dissents were right, would be to remand for findings specifying what part, if any, of the loans by the corporation to Mr. Hardee were made to carry tax-exempt securities within the meaning of I.R.C. § 265(2). The trial judge then should also allow adjustment for any consideration furnished by Mr. Hardee, such as by personally guaranteeing corporate loans from third parties. The dissents face the dilemma that they must either disavow any attempt to measure the actual benefit and how far it was utilized for tax-exempt investments, or else must make elaborate adjustments ending up with a scheme like Judge Goldberg's
 
 
 [1]
 In Martin v. Commissioner, 649 F.2d 1133 (5th Cir.1981), Judge Goldberg's dissenting opinion proposed a remand to determine whether the taxpayers had itemized their deductions, reported tax-exempt interest income or claimed deductions which were limited to a percentage of gross income. He argued that those who could not claim an interest deduction due to the aforementioned circumstances should realize income from an interest-free loan. That case, however, differs from the one before us in that the case before us squarely presents a situation where tax-exempt income and section 265(2) are involved. Moreover, the government has argued for this position during trial and on appeal; something that apparently was not done in Martin, 649 F.2d at 1140 n. 13. Due to these differences the Martin majority could ignore the refinements that Judge Goldberg proposed. We cannot
 
 
 [2]
 LoBue held that the value of the stock option that was in excess of the fair market value given in exchange was compensation and therefore taxable income to the employee
 
 
 [3]
 Section 163 provides in pertinent part:
 § 163. Interest
 (a) General rule.--There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.
 
 
 [4]
 There was also a dissenting opinion by Judge Bruce. Criticism of the Dean decision has been widespread. See, e.g., Jacobs, Of No Interest: Truth, Substance, and Bargain Borrowing, 9 Fla.St.U.L.Rev. 261 (1981); Note, The Income Tax Treatments of Interest Free Loans, 1 Va.Tax Rev. 137 (1981); Taylor and Schnee, Interest-Free Loans: A Need for Caution, 58 Taxes 263 (1980); Duhl and Fine, Interest-Free Loans and the Tax Court: Is Dean Weakening Under IRS Attacks?, 51 J.Tax. 322 (1979); Keller, The Tax Consequences of Interest-Free Loans From Corporations to Shareholders and From Employers to Employees, 19 B.Col.Ind. & Comm.L.Rev. 231 (1978); Duhl and Fine, New Case Allowing Interest Deduction Calls for Reappraisal of No-Interest Loans, 44 J.Tax. 34 (1976); Sneed, Unlabeled Income and Section 483, 1965 U.So.Cal.Tax.Inst. 643
 
 
 [5]
 Section 265(2) provides in pertinent part:
 § 265. Expenses and interest relating to tax-exempt income.
 No deduction shall be allowed for--
 * * *
 (2) Interest.--Interest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this subtitle.
 
 
 [6]
 Even if the majority's analysis of Dean is correct, we are, of course, not bound by a Tax Court's decision
 
 
 [7]
 It is interesting to note that the tax treatment I propose is entirely consistent with the new proposed regulations on fringe benefits. These regulations provide in pertinent part:
 Draft of Proposed Amendments to the Regulations
 The draft amendments to 26 CFR Part 1 are as follows:
 Par. 1. The following new sections are added immediately after § 1.61-16:
 § 1.61-17 (Proposed Treasury Decision not published.) Fringe benefits: gross income derived from personal use of property, services or facilities.
 (a) General rule. If, in connection with the performance of services, a person (or beneficiary thereof) either obtains or uses any property, service or facility, the value of such item (as determined under § 1.61-20) shall be includable in that person's gross income unless--
 (1) the item is a working condition (as defined in § 1.61-18), or
 (2) the item is excluded from gross income for reasons of administrative convenience (as determined under § 1.61-19).
 * * *
 Example (5). V is a vice-president in the employ of S, a steel manufacturer. V intends to purchase $15,000 of tax exempt municipal bonds and obtains a $15,000 personal loan from S for that purpose. S agrees to make the loan at a 20 percent discount from the current personal-loan interest rate being charged by area banks. The reduction in the amount of interest payable, resulting from S's discounted interest rate, is includable in V's gross income. (For a similar example involving taxable corporate bonds, see § 1.16-19, Example (11).)
 * * *
 § 1.61-19 (Proposed Treasury Decision, not published.) Fringe benefits: administrative convenience.
 (a) General rule. Notwithstanding the rules of § 1.61-17 and § 1.61-18, the value of any property, service or facility may be excluded from a recipient's gross income for reasons of administrative convenience. Whether such value will be excluded depends on the facts and circumstances of each case. The relevant factors to be considered include, but are not limited to, the following:
 (1) The relationship between the item and the nature of the employer's business.
 (2) The value of the item.
 (3) The repetitive nature of the item.
 (4) The availability of the item on a nondiscriminatory basis, i.e., whether access to the item is dependent upon the recipient's employment status, job classification or level of compensation.
 (5) Whether the method of furnishing the item is in accordance with normal business practices.
 * * *
 Example (11). M is the general counsel of P, an oil-drilling company. M desires to purchase $20,000 of taxable corporate bonds. P loans M $20,000 at a 5 percent discount from the interest rate currently charged by local banks for unsecured personal loans. The reduction in the amount of interest payable by M to P, resulting from the 5 percent discount, is not included in M's gross income. (For a similar example involving tax-exempt municipal bonds, see § 1.16-17, Example (5).)
 Prentice Hall, Code Volume II, p 70,181, 70,182-70,182.4.